# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| ELLEN MISHAGA, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | 10-cv-03187 |
| | ) | |
| LEO P. SCHMITZ, Director of | ) | |
| the Illinois Department of State | ) | |
| Police; MICHAEL W. VORREYER, | ) | |
| Master Sergeant, Illinois | ) | |
| Department of State Police, | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION

**SUE E. MYERSCOUGH, U.S. District Judge:**

This cause is before the Court on cross-motions for summary judgment.  Defendants Leo P. Schmitz[1] and Michael W. Vorreyer, of the Illinois State Police, seek an order upholding the Illinois Firearm Owner Identification Act ("the FOID Act" or "the Act"), 430 ILCS 65/1 et seq., as constitutional as applied to Plaintiff Ellen Mishaga,

---

[1]  Jonathan Monken is no longer the Director of the Illinois State Police ("Director").  As this matter is proceeding against the Director in his official capacity, the current Director, Leo P. Schmitz, is automatically substituted for Mr. Monken as a Defendant in this matter pursuant to Fed. R. Civ. P. 25(d).

a nonresident of the State of Illinois.  Mishaga seeks an order declaring the FOID Act unconstitutional as applied to her because it violates her rights under the Constitution's Article IV and Second and Fourteenth Amendments.

After extensive discovery and briefing, the undisputed facts in this case demonstrate that Mishaga does not have standing to challenge the FOID Act.  Because Mishaga lacks standing, her complaint contains no live case or controversy.  Accordingly, this Court lacks jurisdiction under Article III of the Constitution, and so Mishaga's Complaint must be dismissed, and Defendants' Motion for Summary Judgment granted.

## I.  JURISDICTION AND VENUE

This Court has subject-matter jurisdiction because Mishaga's complaint, via 42 U.S.C. § 1983, alleges a deprivation, under color of the laws and regulations of the State of Illinois, of rights, privileges, and immunities secured by the United States Constitution.  See 28 U.S.C. § 1343(a)(3).  Venue is proper in this Court because a substantial part of the events or omissions giving rise to Mishaga's claims occurred in the Central District of Illinois. See 28 U.S.C. § 1391(b)(2).

## II.   LEGAL STANDARD

Summary judgment is proper if the movant shows that no genuine dispute exists as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the court of the basis for the motion and identifying the evidence that demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  No genuine issue of material fact exists if no reasonable jury could find in favor of the nonmoving party.  Brewer v. Bd. of Trs. of the Univ. of Ill., 479 F.3d 908, 915 (7th Cir. 2007).  When ruling on a motion for summary judgment, the Court must consider the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in the nonmoving party's favor.  Woodruff v. Mason, 542 F.3d 545, 550 (7th Cir. 2008).

On cross-motions for summary judgment, the same standard of review in Federal Rule of Civil Procedure 56 applies to each movant.  See Cont'l Cas. Co. v. Nw. Nat'l Ins. Co., 427 F.3d 1038, 1041 (7th Cir. 2005).  The Seventh Circuit has explained that courts "look to the burden of proof that each party would bear on

an issue of trial; we then require that party to go beyond the
pleadings and affirmatively establish a genuine issue of material
fact." Diaz v. Prudential Ins. Co. of Am., 499 F.3d 640, 643 (7th
Cir. 2007) (quoting Santaella v. Metro. Life Ins. Co., 123 F.3d 456,
461 (7th Cir. 1997)).  Cross-motions for summary judgment are
considered separately, and each party requesting summary
judgment must satisfy the Rule 56 standard before judgment will be
granted in its favor.  See Tegtmeier v. Midwest Operating Eng'rs
Pension Trust Fund, 390 F.3d 1040, 1045 (7th Cir. 2004);
Santaella, 123 F.3d at 461.  Thus, the facts are construed in favor
of the nonmoving party, which differs depending on which motion is
under consideration.  Tegtmeier, 390 F.3d at 1045.

### III.   BACKGROUND

The following facts are not in dispute.  Plaintiff Ellen Mishaga
is a United States citizen and a resident of Ohio.  (Pl.'s Mot. Summ.
J., d/e 22, at 5.)[2]  Mishaga frequently travels to Illinois with her
husband and, while here, stays in the home of friends who are

---

[2]  All citations to the record in this Opinion use the page numbers
automatically assigned by the Court's electronic case management
system.

Illinois residents.  (Id.)  Mishaga wishes to possess a functional
firearm for her self-defense while staying in her Illinois friends'
home, but she does not wish to possess or carry a functional
firearm outside of her friends' home.  (See id., Ex. 2, at 11.)  At least
one member of Mishaga's Illinois friends' household possesses a
valid Firearm Owner Identification, or "FOID," card and lawfully
possesses firearms for hunting and self-defense purposes.  (See id.,
Ex. 1, at 2.)  Mishaga's Illinois friends want Mishaga to be able to
possess firearms for self-defense while she stays with them in their
home.[3]  (See id. at 3.)

In Illinois, the Firearm Owner Identification Act generally
prohibits a person from possessing firearms or ammunition unless
that person also possesses a FOID card, or unless one of several

_____

[3]  A genuine issue of fact persists in this case as to whether
Mishaga owned any firearms at the time she first filed her
Complaint.  According to Defendants, Mishaga would not have
standing in this suit if she did not own any firearms when she
brought suit.  (See Defs.' Mot. Summ. J., d/e 20, at 3, 9.)
Construing the facts in the light most favorable to Mishaga,
however, the Court assumes, without deciding, that Mishaga did
own firearms in common with her husband at the time she filed her
complaint and that Mishaga could possess firearms, for purposes of
the FOID Act, that belonged to her Illinois friends while in their
home as a guest.  Therefore, the Court's holding that Mishaga lacks
standing rests on other grounds advanced by Defendants.

statutory exceptions applies.  (430 ILCS 65/2; <u>see</u> Defs.' Mot. Summ. J., d/e 20, at 3; Pl.'s Mot. Summ. J., d/e 22, at 8–9.)  One such exception, called Exception 10 throughout this Opinion, provides that nonresidents may possess firearms or ammunition without a FOID card while in Illinois if the nonresidents are "licensed or registered to possess a firearm in their resident state." 430 ILCS 65/2(b)(10).

The Illinois State Police accepts and processes applications for FOID cards, performs background checks on applicants, and issues FOID cards to individuals who are not disqualified by state or federal statutes from possessing firearms.  (See Pl.'s Mot. Summ. J., d/e 22, at 5.)  As part of the application, the Illinois State Police requires applicants to provide the number from a valid Illinois driver's license or Illinois identification card.  (<u>Id.</u> at 6.)  By statute, the only nonresidents who may obtain a FOID card are military, law enforcement, and security personnel employed in Illinois.  (Pl.'s Supplemental Br., d/e 34, at 6; <u>see also</u> 430 ILCS 65/4(a-10) (providing that a FOID applicant "who is employed as a law enforcement officer, an armed security officer in Illinois, or by the United States Military permanently assigned in Illinois and who is

not an Illinois resident" must submit a driver's license or identification card number from his resident state); 430 ILCS 65/8(q) (excluding law enforcement, armed security officers, and military personnel from those nonresidents Illinois State Police has authority to deny a FOID card).)

Mishaga, as an Ohio resident, possesses neither an Illinois driver's license nor an Illinois identification card.  (Id. at 7.) Mishaga also does not have any sort of firearm permit from her state of residence, Ohio, because Ohio does not issue permits merely to possess a firearm and because Mishaga does not want the permit Ohio does issue that would license her to carry a concealed firearm outside of the home.  (Id.)  Further, Mishaga is not disqualified from possessing a firearm or ammunition under any state or federal statute, and she and her husband do lawfully possess firearms in Ohio.  (Id.)  However, Mishaga is not a law enforcement officer, an armed security officer in Illinois, or military personnel permanently assigned in Illinois.

On March 27, 2010, Mishaga submitted an application for a FOID card to the Illinois State Police.  (Id. at 6.)  On April 30, 2010, Defendants denied Mishaga's FOID card application because she

had not provided an Illinois driver's license number or Illinois
identification card number, which she does not have, on the
application.  (Id.)  On May 17, 2010, Mishaga submitted a second
application for a FOID card.  (Id.)  On June 14, 2010, Defendants
denied Mishaga's second application, stating, "Due to Illinois state
law, you must have a valid [Illinois] driver[']s license or [Illinois]
state ID in order to be eligible for an [Illinois] FOID card."  (Id.)

On Defendants' Motion for Summary Judgment, the Court
assumes without deciding that, other than possessing an Illinois
driver's license or Illinois identification card, Mishaga meets every
other qualification for a FOID card.  (Id. at 7.)  Mishaga wishes to be
issued a FOID card because she believes that without a FOID card,
the FOID Act prohibits her from possessing a functional firearm for
self-defense when she stays in her Illinois friends' home.

Mishaga filed suit against Defendants on July 27, 2010,
alleging that Illinois's FOID Act violated her right, under the
Constitution's Article IV and Second and Fourteenth Amendments,
to possess a functional firearm for self-defense while staying in her
Illinois friends' home.  On October 15, 2010, Defendants filed a
Motion to Dismiss, which the Court denied in an Opinion issued

November 22, 2010.  Mishaga filed an Amended Complaint on March 1, 2011.  Following discovery, Defendants and Mishaga filed their respective Motions for Summary Judgment on October 3, 2011.  The Court twice requested supplemental briefing from the parties on March 28, 2014, and denied the parties' Motions for Summary Judgment on September 20, 2014, with leave to refile.

On October 31, 2014, Mishaga filed a renewed Motion for Summary Judgment, and Defendants renewed their Motion for Summary Judgment on November 14, 2014.  These Motions for Summary Judgment (d/e 39 & d/e 40) have been fully briefed and are now ripe for decision.

## IV.   ANALYSIS

### A.   Mishaga's motion to strike Defendants' recent filings is denied.

As a preliminary matter, the Court denies Mishaga's motion to strike incorporated into her Response to Defendants' Supplemental Brief (d/e 41).  Mishaga seeks to strike Defendants' Supplemental Brief (d/e 38) and Defendants' Renewed Motion for Summary Judgment (d/e 40) because, Mishaga says, these motions do not comply with this Court's Order of September 30, 2014, to timely file

a renewed motion for summary judgment and actually violate the
Local Rules of the Central District.

Defendants' motions do comply with the Court's Order of
September 30, 2014 (d/e 37).  The Court's Order of September 30
denied the parties' original cross-motions for summary judgment
"with leave to refile."  (Order Sept. 30, 2014, d/e 37, at 5.)  The
Order further directed the parties to prepare supplemental briefs
addressing five issues.  (See id. at 5–6.)  But as for the need for
further motions for summary judgment, the Order states:  "The
parties' renewed motions for summary judgment are due on or
before October 31, 2014."  (Id. at 6 (emphasis added).)  In
compliance with the Order of September 30, Defendants filed their
supplemental brief on the five issues on October 31 (d/e 38).
Defendants then renewed their motion for summary judgment with
a filing on November 14 (d/e 40).  In other words, with their Motion
to Renew (d/e 40), Defendants chose to refile their previous briefs in
support of a renewed motion for summary judgment.

Mishaga herself recognizes Defendants' purpose to renew their
previous motion for summary judgment:  Mishaga requests, as an
alternative to striking Defendants' most recent filings, that the

Court accept her own previous filings in response to Defendants'
motion. (<u>See</u> Pl.'s Mot. Strike & Resp. Defs.' Supp. Brief, d/e 41, at
11 n.4.) The Court will, therefore, accept both parties' filings to
effectuate the Court's purpose, allowed under the Order of
September 30, 2014, to grant the parties "leave to refile" renewed
cross-motions for summary judgment. Moreover, by accepting both
parties' previous and current filings, the Court does not prejudice
Mishaga by accepting Defendants' late Motion to Renew (d/e 40),
because Mishaga had and took the opportunity to address all of
Defendants' renewed arguments in briefing the original cross-
motions for summary judgment.

The Court also does not find that Defendants' motions violate
the Local Rules of the Central District. Again, the Court's Order of
September 30, 2014, granted the parties "leave to refile," (Order
Sept. 30, d/e 37, at 5), and directed the filing of "renewed motions
for summary judgment," (<u>id.</u> at 6). Defendants renewed their
original motion for summary judgment by reference in their Motion
to Renew (d/e 40). Mishaga does not contend that Defendants'
original motion for summary judgment was out of step with the
Local Rules, and Defendants' Motion to Renew merely readopted the

original motion.  And again, though the Motion to Renew was filed on November 14, Defendants' tardiness did not prejudice Mishaga because Defendants' Motion to Renew simply reinstated arguments to which Mishaga had had, and taken, the opportunity to respond on the original cross-motions for summary judgment.  And though indeed Local Rule 7.1(D) provides that "[a]ny filings not in compliance <u>may</u> be stricken by the Court," emphasis added, the Local Rule is a permissive one; the rule does not require the Court to strike filings not in compliance.

At this stage, and especially because the Court requested additional briefing sua sponte, the Court risks abusing its discretion if the Court were to strike Defendants' filings where Mishaga has had every opportunity and incentive to respond effectively.  <u>See</u> <u>Waldridge v. Am. Hoechst Corp.</u>, 24 F.3d 918, 923 (7th Cir. 1994) (finding no abuse of discretion in district court's strict application of local rule), <u>citing</u> <u>McGann v. Ne. Ill. Regional Commuter R.R. Corp.</u>, 8 F.3d 1174, 1178 n.3 (7th Cir. 1993) (refusing to reject filing as out of step with local rule where district court did not find party out of compliance).  Accordingly, the Court will not strike Defendants' recent filings.

The parties have submitted competing motions for summary judgment:  Defendants through their Renewed Motion for Summary Judgment, which "adopt[s] and re-file[s] their previously-filed motion for summary judgment, response[,] and reply," (d/e 40, at 2), and Mishaga through her most recent Motion for Summary Judgment (d/e 39).  The Court will apply the summary judgment standard to these filings and all earlier filings in support of the parties' prior motions for summary judgment, responses, replies, and other supplemental and responsive filings (d/e 20; d/e 22; d/e 23; d/e 24; d/e 25; d/e 26; d/e 28; d/e 29; d/e 31; d/e 32; d/e 33; d/e 34; d/e 35; d/e 38; d/e 41; d/e 42), considering the facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in the nonmoving party's favor.  See Woodruff, 542 F.3d 545, 550.

Having made clear the Court's domain of materials under consideration, the Court turns to analysis of Mishaga's claims.

**B.    Mishaga does not have standing to challenge the FOID Act because Exception 10 exempts her from liability as a nonresident who is legally eligible to possess a firearm in her resident state.**

Mishaga has never been prosecuted for a violation of Illinois' FOID Act, and so she has standing to challenge the Act only if she faces a credible threat of prosecution under the Act.  Mishaga only faces a credible threat of prosecution, in turn, if the conduct which she wishes to engage in—the possession of a functional firearm for self-defense in a resident's private home by a nonresident who does not possess a FOID card or a license document from her resident state—is, in fact, unlawful under the FOID Act.

> *1.    Mishaga does not have standing if she does not face a credible threat of prosecution for violating the FOID Act.*

Article III of the United States Constitution limits the jurisdiction of the federal courts to live "cases or controversies." Rock Energy Coop. v. Vill. of Rockton, 614 F.3d 745, 748 (7th Cir. 2010).  One requirement of a live case or controversy is that the plaintiff must have standing to sue.  Standing has been described as a "personal stake in the outcome" of the suit "sufficient to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of

difficult questions." <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 583 (1992) (Stevens, J., concurring in the judgment) (quoting <u>Baker v. Carr</u>, 369 U.S. 186, 204 (1962)).  To demonstrate a sufficient personal stake to have standing, a plaintiff must establish 1) that she has suffered an injury in fact, the invasion of a legally protected interest that is concrete and particularized and actual or imminent rather than conjectural or hypothetical; 2) that a causal connection links the injury and the conduct complained of so that the injury is fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party who is not before the court; and 3) that it is likely, not merely speculative, that a favorable legal decision will redress the injury.  <u>See</u> <u>Lujan</u>, 504 U.S. at 560–61.

A plaintiff who wishes to challenge a law as running contrary to her constitutional rights need not actually break the law, suffering the dignitary harm and risk of fines or imprisonment attendant to criminal prosecution, in order to meet the burden of standing.  <u>See, e.g.</u>, <u>Babbitt v. United Farm Workers Nat'l Union</u>, 442 U.S. 289 (1979) (establishing two-part test for First Amendment challenges to criminal statutes:  (1) intention to engage in conduct

proscribed by statute, and (2) credible threat of prosecution therefor).  In such circumstances, however, the plaintiff must at least demonstrate that she has an "actual and well-founded fear that the law will be enforced against her."  Wis. Right to Life, Inc. v. Paradise, 138 F.3d 1183, 1185 (7th Cir. 1998).  Where an actual and well-founded fear of prosecution exists, the requirements of standing—an injury in fact that is concrete, particular, and imminent, that is fairly traceable to the defendant's conduct, and that is redressable through a favorable judicial decision—are met.

This "credible threat of prosecution" standard has been characterized as a "forgiving" one, see Deida v. City of Milwaukee, 192 F. Supp. 2d 899, 906 (E.D. Wis. 2002).  Courts should find that a plaintiff has met her burden upon a showing that the government has "fail[ed] to indicate affirmatively that it will not enforce the statute" against the plaintiff for her intended conduct, Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n, 149 F.3d 679, 687 (7th Cir. 1998).  Moreover, disavowal of the intent to enforce the statute in a case in which the statute applies requires the state to do more than say during litigation that it does not intend to prosecute the plaintiff.  See, e.g., Babbitt, 442 U.S. at 302;

Citizens for Responsible Gov't State Political Action Comm. v. Davidson, 236 F.3d 1174, 1192–93 (10th Cir. 2000); see also Majors v. Abell, 317 F.3d 719, 721 (7th Cir. 2003) ("A plaintiff who mounts a pre-enforcement challenge to a statute that he claims violates his freedom of speech need not show that the authorities have threatened to prosecute him; the threat is latent in the existence of the statute.").  But no threat of prosecution exists, and a fear of prosecution is not well-founded, where the statute "clearly fails to cover [the plaintiff's] conduct."  Id.  Though a person might in fact be prosecuted under a statute the text of which clearly failed to cover her conduct, the perceived risk of such a prosecution cannot justify an injunction without some indication of a nontrivial probability of prosecution.  See Lawson v. Hill, 368 F.3d 955, 958.  Stated differently, a fear of prosecution that is not objectively well-founded, alone, will not suffice to confer standing, no matter how genuinely felt.  Wis. Right to Life, Inc., 138 F.3d at 1185.

In Lawson, the plaintiff, a 17-year-old high-school student, brought suit under 42 U.S.C. § 1983 challenging Indiana's flag desecration statute as contrary to the First Amendment.  368 F.3d at 956.  The statute provided that "a person who knowingly or

intentionally mutilates, defaces, burns, or tramples any United

States flag, standard, or ensign commits flag desecration, a Class A

misdemeanor," punishable by up to a year in prison and a $5,000

fine.  Id.; see Ind. Code §§ 35–45–1–4(a), 35–50–3–2.  The plaintiff

had participated in several student demonstrations against the

United States' war in Iraq, and in one such demonstration, she had

displayed her own American flag on which she had painted a peace

symbol.  Id.  The local police chief, present at the demonstration,

called the flag "contraband" and stated that painting a peace sign

on a flag was illegal.  Id.  But the police chief did not arrest the

plaintiff, nor anyone else, and he left the demonstration.  Id.  After

another, similar demonstration, a member of the local county board

called for prosecution of the student demonstrators.  Id.  The

defendant, an elected county prosecutor, later learned of the

demonstrations but instructed the police chief not to investigate the

students for violating the flag desecration law.  Id. at 956–57.

The plaintiff sued the county prosecutor—not the police chief

or the county board member—to enjoin her future prosecution

under the flag desecration law.  Id.  But the county prosecutor had

directed that no investigation take place precisely because he

recognized that the Supreme Court had held that the First Amendment prohibits punishing people who deface the American flag in order to make a political statement.  Id. at 957 (citing collected cases so holding).  Therefore, the Seventh Circuit held that the plaintiff's suit was properly dismissed for lack of standing where the plaintiff "had no reason to think she had any dispute with [the defendant county prosecutor], much less one that might have tangible consequences for her."  Id.

The Seventh Circuit further distinguished the case from others in which the defendant state has failed to disavow the intent to prosecute adequately, offering only assurances during litigation that it did not intend to prosecute the plaintiff:  "such disavowals are important only in cases in which, without a disavowal, the plaintiff seeking to enjoin enforcement would have a reasonable basis for concern that [she] might be prosecuted."  Id. at 959.  "[W]ithout requiring well foundedness," the court concluded, state "officials will be overwhelmed with requests for legal advice."  Id.  Therefore, the court concluded that the risk of prosecution was too remote there to confer standing on the plaintiff.  Id.

In the case now before this Court, Mishaga has asserted that she fears prosecution for possessing a functional firearm in her Illinois friends' home without also possessing either a FOID card, which Defendants will not issue to her, or a license that her resident state does not issue. Defendants have offered their only reassurances during litigation that they will not seek to prosecute Mishaga and that they believe that Mishaga's conduct is lawful under the FOID Act. The question of Mishaga's standing to sue, then, turns on the issue of whether her fear of prosecution is well-founded because the FOID Act makes unlawful her planned course of conduct, or whether, instead, the risk of prosecution is too remote to confer standing on Mishaga because the FOID Act clearly fails to cover her planned course of conduct.

   2.   *Mishaga does not face a credible threat of prosecution for violating the FOID Act because Exception 10 permits her to possess a functional firearm in the home of her Illinois-resident friends.*

Mishaga's fear of prosecution is not well-founded, and she does not face a credible threat of prosecution under the FOID Act, because Exception 10 permits her, a nonresident, to possess a functional firearm in the home of her Illinois-resident friends. Both

a plain-meaning analysis of the FOID Act's text and an analysis of
its legislative purpose and legislative history support this
conclusion.

> a.   *The plain language of Exception 10 exempts Mishaga*
> *from criminal liability under the FOID Act.*

A plain-language analysis of Exception 10 demonstrates that
Mishaga, a nonresident of Illinois, faces no prospect of criminal
liability under Illinois's FOID Act because, as a matter of law, she is
"licensed . . . to possess a firearm in [her] resident state."  430 ILCS
65/2(b)(10).

> The FOID Act provides, in pertinent part:
>
> (a)(1)  No person may acquire or possess any firearm . . .
> within this State without having in his or her possession
> a Firearm Owner's Identification Card previously issued
> in his or her name by the Department of State Police
> under the provisions of this Act.

430 ILCS 65/2(a)(1).  The FOID Act's Exception 10 further provides:

> (b) The provisions of this Section regarding the
> possession of firearms, firearm ammunition, stun guns,
> and tasers do not apply to:
>
> ***
>
> (10) Nonresidents who are currently <u>licensed or</u>
> <u>registered</u> to possess a firearm in their resident state[.]

430 ILCS 65/2(b)(10) (emphasis added).

Whether Exception 10 applies to Mishaga turns on the issue of whether, as a matter of law, she is "licensed or registered" to possess firearms in her resident state, Ohio.  The parties focus their attention in briefing on whether Mishaga is "licensed" to possess a firearm in Ohio, and they do not address at length whether Mishaga is "registered" for purposes of Exception 10.  In interpreting Exception 10, however, the Court must address the plain meaning of both "licensed" and "registered."

The FOID Act does not define the term "licensed," see 430 ILCS 65/1.1 ("Definitions"), nor has the Illinois Supreme Court given the term "licensed," as used in Exception 10, an authoritative interpretation.  Mishaga contends that she cannot be "licensed" by Ohio to possess a firearm because she has not applied for and received permission, in the form of a permit or other document, to possess a firearm.  (See Pl.'s Mem. Support Pl.'s Mot. Summ. J., d/e 39, at 19.)  In fact, Ohio does not issue a permit or license document to possess firearms, only a license to carry concealed weapons, which Mishaga does not have or want.  (Id. at 20.)  Defendants, conversely, contend that Mishaga is "licensed" to possess a firearm by the State of Ohio by virtue of the fact that she

is legally eligible to possess firearms in Ohio.  (Defs.' Mem. Law
Support Mot. Summ. J., d/e 20, at 7.)

The duty of the court in parsing the language of a statute is to
give effect to the plain meaning of the statute's text.  See, e.g., Dodd
v. United States 545 U.S. 353, 357 (2005) ("We must presume that
the legislature says in a statute what it means and means in a
statute what it says there."  (citations omitted)); United States v.
Gonzalez, 520 U.S. 1, 4 (1997) ("Our analysis begins, as always,
with the statutory text.").  Where no state supreme court decision
renders an authoritative interpretation of a state statute's text, a
federal court is obliged to analyze a state statute predictively as the
state supreme court would.  See ADT Sec. Servs., Inc. v. Lisle-
Woodridge Fire Prot. Dist., 672 F.3d 492, 498 (7th Cir. 2012).  In
Illinois, "[t]he most fundamental rule of statutory construction is to
give effect to the intent of the legislature.  The best evidence of
legislative intent is the language used in the statute itself and that
language must be given its plain and ordinary meaning."  King v.
First Capital Fin. Servs. Corp., 828 N.E.2d 1155, 1169 (Ill. 2005).
"If the language of the statute is clear, its plain and ordinary
meaning must be given effect without resorting to other aids of

construction." Id.  A "statute should be read as a whole with all

relevant parts considered." Vancura v. Katris, 939 N.E.2d 328, 350

(Ill. 2010).

Without statutory or state-court definitions, the Court turns

first to dictionary definitions to ascertain plain meaning.  Black's

Law Dictionary defines "licensed" as "[h]aving official permission to

do something, usu. as evidenced by a written certificate."  Licensed,

Black's Law Dictionary (Bryan A. Garner ed., 10th ed. 2014).

"Licensed" is the past participle of "license," under which further

useful dictionary definitions are found.  Black's, for instance,

defines "license" in the following way:

> 1.  A privilege granted by a state or city upon the
> payment of a fee, the recipient of the privilege then being
> authorized to do some act or series of acts that would
> otherwise be impermissible. • A license in this sense is a
> method of governmental regulation exercised under the
> police power, as with a license to drive a car, operate a
> taxi service, keep a dog in the city, or sell crafts as a
> street vendor. — Also termed *permit*.
>
> 2. A permission, usu. revocable, to commit some act that
> would otherwise be unlawful; esp., an agreement (not
> amounting to a lease or profit à prendre) that it is lawful
> for the licensee to enter the licensor's land to do some act
> that would otherwise be illegal, such as hunting game.

License, Black's Law Dictionary (Bryan A. Garner ed., 10th ed. 2014).

The parties appear to agree, moreover, that Black's Law Dictionary provides evidence of the plain meaning of the terms "license" and, by extension, "licensed"; both parties cite the definition of "license" in Black's fifth edition.  To Mishaga, to be "licensed" means that "a person has applied for and received permission (generally in the form of a document) from an issuing authority," (Pl.'s Mot. Summ. J., d/e 39, at 19), because the Black's definition of "license" includes the following two quotations:  "[t]he permission by a competent authority to do an act which, without permission, would be illegal . . ." and "certificate or the document itself which gives permission," Black's Law Dictionary 829 (5th ed. 1979).  To Defendants, however, "licensed" must mean "permit[ted] . . . to buy and possess firearms unless otherwise prohibited by a specific state law," a conclusion Defendants reach by reference to the first of Mishaga's proffered Black's quotations. (See Defs.' Supplemental Br., d/e 38, at 2–3.)  In sum, the definitions in Black's fifth and tenth editions lend adequate support to both parties' preferred interpretations of the word "licensed"—for

Mishaga, that a license is a "certificate or . . . document . . . which gives permission," and for Defendants, that license is merely "permission by a competent authority to do an act which, without permission, would be illegal."

A perusal of additional dictionaries' definitions further illustrates the Delphic nature of the word "licensed."[4] Merriam-Webster's Collegiate Dictionary, for instance, gives three definitions for the verb "license," and notes its past participle "licensed": "to issue a license to;" "to permit or authorize esp. by formal license;" and "to give permission or consent to." License, Merriam Webster's Collegiate Dictionary 671 (10th ed. 1997). The Merriam Webster's definition for the noun "license" also evinces the parties' competing definitions: "a permission granted by competent authority to engage in a business or occupation or in an activity otherwise

---

[4] A comprehensive list of the dictionaries the Court consulted in its analysis appears at Appendix A, with extensive quotations from the definitions. The Court has assayed to provide excerpts from the definitions that are both complete and most generous to each party's position, omitting those definitions that plainly pertain only to the private license a landowner grants to non-trespassers and other, non-legal definitions.

unlawful;" "a document, plate, or tag evidencing a license granted." Id.

Likewise, the American Heritage Dictionary of the English Language shows that "license" can mean either legal eligibility or a permit or other document evidencing that eligibility. For the noun, American Heritage provides both "[o]fficial or legal permission to do or own a specified thing" and "[a] document, plate, or tag that is issued as proof of official or legal permission: [e.g.,] a driver's license." License, American Heritage Dictionary of the English Language 1009 (4th ed. 2000). For the verb, American Heritage, like Merriam Webster's, notes the past participle "licensed" and provides both "[t]o give or yield permission to or for" and "[t]o grant a license to or for; authorize." Id.

Due to the consistent occurrence of equally valid, competing definitions, then, an examination of dictionaries to discern the plain meaning of the words "license" and "licensed," alone, does not resolve the parties' dispute. Though many definitions show that a document generally or usually manifests the official permission granted in a "license," as Mishaga contends, the same definitions make clear that such official permission in the absence of a

document is also central to the concept of "license," supporting
Defendants' view.  The Court must, therefore, turn to other aids of
statutory construction, reading the FOID Act as a whole with all
relevant parts considered.

To begin, though the parties cannot agree on the meaning of
"licensed" as used in Exception 10, they do appear to agree that
Mishaga is not "registered" to possess a firearm in her resident
state, Ohio.  And as used in Exception 10, the term "registered"
sheds some light on what is meant by the term "licensed," since
nonresidents qualify for an exemption from liability if they are
"licensed or registered" to possess firearms lawfully in their resident
states.  430 ILCS 65/2(b)(10) (emphasis added).  Accordingly, the
Court turns to the plain meaning of "registered" as used in
Exception 10.  In exploring the meaning of "registered," the Court is
guided by precedent counseling that "a statute should be
interpreted so as not to render one part inoperative, superfluous[,]
or meaningless." McClain v. Retail Food Emp'rs Joint Pension Plan,
413 F.3d 582, 587 (7th Cir. 2005).  The Court notes also, however,
that this principle of statutory construction, also known as the
nonsurplusage canon, is "often not dispositive because redundant

provisions are not unusual in statutes." Hernandez v. Citifinancial

Servs., Inc., No. 05 C 2263, 2005 WL 3430858, at *5 (N.D. Ill. Nov.

9, 2005) (citing Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253

(1992) ("[r]edundancies across statutes are not unusual events in

drafting")).

　　　As before, the Court follows the parties' lead in turning to

dictionary definitions to ascertain plain meaning.  Black's Law

Dictionary defines the noun "register" as "[a]n official list of the

names of people, companies, etc.; esp., a book containing such a

list."  Register, Black's Law Dictionary (Bryan A. Garner ed., 10th

ed. 2014).  Mishaga also provides citations to "register" and

"registered" in Black's fifth edition:  "register" means "to enroll; to

enter precisely in a list or the like," Register, Black's Law Dictionary

1153 (5th ed. 1979), and "registered" means being "[e]ntered or

recorded in some official register or list," id. at 1154.  (See Pl.'s Mot.

Summ. J., d/e 39, at 19.)

　　　Applying the nonsurplusage canon, the Court interprets

Exception 10 to avoid reading the phrase "licensed or registered" to

contain inoperative, superfluous, or meaningless words.  If

"registered" means "entered or recorded in some official list," and

"register" means "to enroll" or "to enter precisely in a list or the like," then "licensed" must mean something other than enrollment or recording in an official list.  Furthermore, the disjunctive "or" in Exception 10's "licensed or registered" language makes plain that a nonresident need not be both licensed and registered, but only one or the other.  By this reasoning, the best reading of "licensed," as used in Exception 10, is the meaning asserted by Defendants, which requires a nonresident to be merely legally eligible to possess a firearm in order to be "licensed" by her resident state as a matter of law.

To be sure, being enrolled in an official list ("registered") and being issued a document as proof of official or legal permission ("licensed") are not exactly the same thing.  But the distinction yields little difference in the context of the FOID Act:  If a person were already enrolled in an official list to possess a firearm in her resident state, what further purpose would a license, as Mishaga insists is required, serve to impart proper state authorization?[5]  And

_____

[5]  To be clear, the Court does not doubt that a license could be a useful tool to promote public safety, as the D.C. Circuit recently concluded in upholding a resident licensing scheme under

would not the keeping of a list of individuals who have been issued

a license serve precisely the same purpose, and lead to the same

practical result, as the keeping of an enrollment list of those

individuals who are registered to lawfully possess firearms in the

first instance?  "Licensed," as used in Exception 10, must,

therefore, mean something other than to be entered onto official

lists.  In light of the definitions that show that the concept of

"license" does not require a document and the deployment of the

nonsurplusage canon to distinguish "licensed" from "registered," the

Court concludes that Defendants' definition of "licensed"—legal

eligibility, with or without a license document—provides the more

persuasive reading of Exception 10.  Moreover, the Ohio Right of

Individual to Possess Firearm statute specifically exempts Ohio

residents from needing further licensing than that permitted in the

---

intermediate scrutiny.  Heller v. District of Columbia, No. 14-7071,
2015 WL 5472555, at *7–*9 (D.C. Cir. Sept. 18, 2015).  The point
here is only that a state may grant its residents license to possess
firearms in many ways consistent with the Second Amendment, of
which issuance of a license is only one—and a more burdensome
method than mere acquiescence in the exercise of the right by
qualified individuals, the policy in Ohio and many other states.  But
nothing about the permissibility of a scheme of licensing documents
nullifies the concept of "license" as "legal eligibility."

statute:  "Except as specifically provided by the United States

Constitution, Ohio Constitution, state law, or federal law, a person,

without further license, permission, restriction, delay, or process,

may own, possess, purchase, sell, transfer, transport, store, or keep

any firearm, part of a firearm, its components, and its ammunition."

(Emphasis added.)

Mishaga argues that "licensed" must require a license

document by reference to People v. Holmes.  948 N.E.2d 617 (Ill.

2011).  But Holmes did not hold that a license document is the

irreducible minimum of Exception 10's "licensed or registered"

requirement.  In Holmes, the defendant, an Indiana resident who

had been issued a handgun carry permit in Indiana,[6] was convicted

---

[6]  The Holmes case was not clear about what sort of permit the
defendant had been issued in Indiana.  See, e.g., Holmes, 948
N.E.2d at 620 ("Defendant told the officer he had an Indiana permit
for the gun, which he did not have with him."); id. at 621 ("Under
the FOID Card Act, an out-of-state resident who possesses a valid
permit or license from his state is not required to obtain a FOID
card.").  But a permit or license does not appear to be necessary
merely to possess a handgun in Indiana.  See National Rifle
Association Institute for Legislative Action, Indiana State Profile,
http://www.nraila.org/gun-laws/state-gun-laws/indiana/ (last
visited September 22, 2015, as were the other websites cited in this
Opinion) ("No state permit is required for the possession of a rifle,
shotgun, or handgun."); accord Law Center to Prevent Gun

in Illinois of Aggravated Unlawful Use of a Weapon ("AUUW") under

720 ILCS 5/24–1.6(a)(1) & (3)(C).  Id. at 621.  The AUUW statute

generally prohibits the carrying or possession of a firearm in most

public places when "the person possessing the firearm has not been

issued a currently valid [FOID] Card."  720 ILCS 5/24-1.6(a)(1) &

(3)(C).

    At trial, the defendant sought leave to offer his Indiana

handgun carry permit into evidence and sought dismissal of the

AUUW count because the FOID Act's Exception 10, 430 ILCS

65/2(b)(10), exempted him from the requirement to obtain a FOID

card as a nonresident licensed by his resident state.  See Holmes,

948 N.E.2d at 620–21.  The trial court denied the defendant leave to

enter his handgun carry permit into evidence, concluding that the

---

Violence, Registration of Firearms Policy Summary (Oct. 1, 2013),
http://smartgunlaws.org/registration-of-firearms-policy-summary/
(not including Indiana among states for which a license is required
for firearm purchase or possession).  Moreover, in the special
concurrence in Holmes, Illinois Supreme Court Justice Rita
Garman agreed with the majority's analysis and conclusion that
"the exception contained in the FOID Card Act for nonresidents
licensed to carry a gun in their home state must be read into the
[Aggravated Unlawful Use of a Weapon] statute."  948 N.E.2d at 628
(Garman, J., specially concurring) (emphasis added).  The Court
concludes, therefore, that Holmes must have had an Indiana
handgun carry permit.

permit was not a substitute for a FOID card as a matter of law.  Id.
at 621.

The intermediate Appellate Court affirmed, but the Illinois
Supreme Court reversed and vacated the defendant's conviction.
Id. at 626.  The Illinois Supreme Court reasoned that absurd
results would follow if Exception 10 would exempt the defendant
from criminal liability for a misdemeanor under the FOID Act but
not for a felony under the AUUW statute.  See id. at 624; id. at 627–
28 (Garman, J., specially concurring).  The court held, therefore,
that the FOID Act and the AUUW statute must be read together and
that the FOID Act's Exception 10 must excuse criminal liability
under both statutes.  Id. at 624.  Moreover, the court rejected the
State of Illinois's position that, even if Exception 10 applied to the
AUUW statute, a defendant would be required to have his out-of-
state permit in his possession to avail himself of the exception.  Id.
at 625.  Accordingly, the court concluded that the trial court had
erred when it denied the defendant the opportunity to "produce
evidence that he had been issued a valid Indiana permit."  Id.

Because the Holmes court reversed the trial court for denying
the defendant leave to introduce his Indiana permit into evidence to

support his exemption from criminal liability under Exception 10,

Mishaga draws the conclusion that "Exception 10 applies to only

those nonresidents that have been 'issued' a document evidencing

that person's ability to possess a firearm in his resident state."

(Pl.'s Mot. Summ. J., d/e 39, at 22.)  But Mishaga's conclusion goes

too far; nothing about the <u>Holmes</u> court's reasoning requires such a

narrow rule.  The <u>Holmes</u> court merely held that one kind of

evidence, an issued license document, should be admitted in a

particular case to substantiate an exemption from liability under

Exception 10.  Nothing in <u>Holmes</u> would preclude a nonresident

from a different state—one that does not issue such license

documents—from offering her own evidence in a different case that

she is nevertheless "licensed or registered" as required to qualify for

an exemption from criminal liability under Exception 10.  Indeed, if

a nonresident who has been issued a license need not possess that

document at the same time as he possesses a firearm to avail

himself of Exception 10, <u>a fortiori</u> a nonresident whose resident

state does not even issue license documents, like Mishaga, need not

possess any license document to avail herself of Exception 10.

Mishaga further argues that "licensed" in Exception 10 requires a license document because Ohio cannot grant permission or legal eligibility to exercise a right, the in-home possession of a functional firearm for self-defense, that predates the founding of our nation, and that the Second Amendment merely codified.  (Pl.'s Mot. Strike & Resp. Defs.' Supplemental Br., d/e 41, at 17–18.) According to Mishaga, because this right does not emanate from Ohio law, but is rather a fundamental right, see District of Columbia v. Heller, 554 U.S. 570, 592 (2008), Ohio does not "license" her in the sense of granting her legal eligibility.

The right to keep and bear arms codified in the Second Amendment is not an unlimited one.  Heller, 554 U.S. at 595. Recognizing that the right to keep and bear arms can be regulated or circumscribed without running afoul of the Constitution, the Seventh Circuit has applied heightened scrutiny to uphold categorical bans on certain individuals' possession of firearms.  See, e.g., United States v. Meza-Rodriguez, --- F.3d ---, 2015 WL 4939943, at *7–*8 (7th Cir. Aug. 20, 2015) (upholding 18 U.S.C. § 922(g)(5)'s criminalization of possession of a firearm by an unauthorized alien); United States v. Yancey, 621 F.3d 681, 687

(7th Cir. 2010) (upholding 18 U.S.C. § 922(g)(3)'s criminalization of possession of a firearm by an unlawful user of a controlled substance); <u>United States v. Williams</u>, 616 F.3d 685, 694 (7th Cir. 2010) (upholding 18 U.S.C. § 922(g)(1)'s criminalization of possession of a firearm by a convicted felon); <u>United States v. Skoien</u>, 614 F.3d 638 (7th Cir. 2010) (en banc) (upholding 18 U.S.C. § 922(g)(9)'s criminalization of possession of a firearm by a person convicted of a misdemeanor crime of domestic violence); <u>accord</u> <u>Heller</u>, 554 U.S. at 626 ("[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill . . . ."). So, too, have other Courts of Appeals upheld certain categorical bans. <u>See, e.g.</u>, <u>Williams</u>, 616 F.3d 685, 693 (collecting cases upholding § 922(g)(1) under <u>Heller</u>).

Mishaga is not banned from possession of a firearm in Ohio or in Illinois. But the constitutionality of laws regulating who may possess firearms, how, and where, belies Mishaga's notion that a right predating our nation's founding and the ratification of the Second Amendment is, for that reason, a right not subject to appropriate state authorization or permission in its continuing

exercise.  Cf. Moore v. Madigan, 708 F.3d 901, 903–04 (7th Cir. 2013) (Hamilton, J., dissenting from denial of rehearing en banc) (discussing the enduring authority of states to regulate who may possess firearms, how, and where, including requirement upheld by the Second Circuit that an applicant show "proper cause" to obtain a carry permit); Moore v. Madigan, 702 F.3d 933, 940 (7th Cir. 2012) (adding "children" to those prohibited from gun ownership without controverting Heller).  Accordingly, the fact that the pre-existing right to possess functional firearms in the home for self-defense was merely codified, not created, by the Second Amendment does not alter the authority of the states to license that right under permissible circumstances—either by issuance of license documents, as Illinois does for her residents, or by tacit acquiescence in the otherwise-regulated exercise of the right by qualified individuals, as is the practice in Ohio.

In sum, a plain-meaning analysis of Exception 10 shows that nonresidents "licensed or registered" in their resident states include all those nonresidents who are legally eligible to possess firearms in their resident states, not just those nonresidents who have been issued a license document in their resident states.  Mishaga's final

textual argument to the contrary, a comparison with another of the
FOID Act's exceptions for certain nonresident hunters, is best
understood in the context of the Act's purpose and legislative
history.

> b.   *The purpose of the Illinois General Assembly in passing*
>      *the FOID Act and each of its exceptions is consistent*
>      *with Mishaga's exemption from criminal liability under*
>      *Exception 10.*

Like a plain-meaning analysis of the FOID Act's text, an
analysis of the purpose of the Illinois General Assembly and the
legislative history in passing the FOID Act and its exceptions is also
consistent with Mishaga's exemption from criminal liability under
Exception 10.

The first section of the FOID Act, the "[l]egislative declaration,"
provides:

> It is hereby declared as a matter of legislative
> determination that in order to promote and protect the
> health, safety and welfare of the public, it is necessary
> and in the public interest to provide a system of
> identifying persons who are not qualified to acquire or
> possess firearms, firearm ammunition, stun guns, and
> tasers within the State of Illinois by the establishment of
> a system of Firearm Owner's Identification Cards, thereby
> establishing a practical and workable system by which
> law enforcement authorities will be afforded an
> opportunity to identify those persons who are prohibited
> by [720 ILCS 5/24-3.1], from acquiring or possessing

firearms and firearm ammunition and who are prohibited
by this Act from acquiring stun guns and tasers.

430 ILCS 65/1 (emphasis added).  The language of this legislative

declaration evinces the General Assembly's purpose to identify

those individuals who should be disqualified from possessing

firearms.  The legislative declaration is also not clear whether the

practical and workable system to identify disqualified individuals

should apply to Illinois residents only—"persons . . . within the

State of Illinois"—or all persons, regardless of state of residence,

who are "not qualified to acquire or possess firearms" while they are

found "within the State of Illinois."  But, as previously discussed at

length, a plain-meaning analysis of the text of Exception 10

exempts nonresidents "licensed or registered" in their resident

states from criminal liability under the FOID Act.  And, as shall be

seen, a practical and workable system to identify disqualified

individuals—and conversely, to issue FOID cards to qualified

individuals—should properly be understood to cover Illinois

residents only, not nonresidents.

Several lines of reasoning drive this conclusion.  First,

according to the Law Center to Prevent Gun Violence, only six

states—California, Connecticut, Hawaii, Maryland, New York, and New Jersey—and the District of Columbia require their residents to register various kinds of firearms, including the handguns preferred for self-defense purposes.  See Law Center to Prevent Gun Violence, Registration of Firearms Policy Summary (Oct. 1, 2013), http://smartgunlaws.org/registration-of-firearms-policy-summary/; see also National Rifle Association Institute for Legislative Action, State Gun Laws, http://www.nraila.org/gun-laws/state-gun-laws/ [hereinafter "NRA-ILA, State Gun Laws"] (providing links to summaries of 50 states' firearm laws and regulations).  Only another six states more—Iowa, Massachusetts, Michigan, Nebraska, North Carolina, and Rhode Island—join Illinois and the six registration states listed above in requiring that their residents who wish to purchase or possess certain types of firearms first receive a permit or a license from the state in order to do so. See Law Center to Prevent Gun Violence, Licensing Gun Owners & Purchasers Policy Summary (Aug. 23, 2013), http://smartgunlaws.org/licensing-of-gun-owners-purchasers-policy-summary/; see also NRA-ILA, State Gun Laws.  Notably, just one of the five states that borders Illinois—Iowa—imposes a license

or registration requirement for mere possession of any kind of firearm on its residents.

In brief, if the FOID Act required a license document for nonresidents to qualify for an exemption from criminal liability under Exemption 10, as Mishaga insists, then residents of bordering states Wisconsin, Missouri, Kentucky, and Indiana could never qualify under Exception 10 unless and until those states' legislatures changed their laws.[7]  More broadly speaking, nonresidents hailing from 37 states in all, including Mishaga's resident state of Ohio, could never qualify under Exception 10. This absurd result cannot have been the General Assembly's intention when it endeavored to create a "practical and workable system" to identify individuals disqualified from possessing firearms and exempted nonresidents who were "licensed or registered to possess firearms in their resident state."  Defendants' reading of Exception 10 yields a much more sensible result:  "licensed or

---

[7]  Nonresidents, including those from border states, could always obtain concealed carry permits in their resident states, of course. But Exception 10 requires only that a nonresident be "licensed or registered to possess" firearms in their residents states, not to carry firearms.  430 ILCS 65/2(b)(10).

registered" means nothing more than legally eligible to possess a firearm, whether or not evidenced by a license document.

Furthermore, Mishaga's reading of "licensed or registered" would criminalize much additional commonplace conduct by nonresidents.  To wit, another exception under the FOID Act, called Exception 5 in this Opinion, exempts "[n]onresident hunters during hunting season, with valid nonresident hunting licenses and while in an area where hunting is permitted," provided that nonresident hunters keep their firearms unloaded and enclosed in a case at all other times.  430 ILCS 65/2(b)(5).  Assume for the moment that these nonresident hunters would not be exempt under Exception 10, too, unless hailing from one of the twelve states—only one, Iowa, bordering Illinois—that issue license documents or register firearms owners.  Under Mishaga's reading of Exception 10, if such a nonresident hunter arrived in Illinois a day before hunting season began, he could not lawfully remove his firearm from its case to clean it or to sight it in on a practice target on private land.[8]  While

_____

[8]  Discharge of a firearm while on one's own land or an invitee on another's land is not prohibited unless done knowingly or intentionally in certain unsafe circumstances, such as in the

remaining in Illinois, he could not lawfully remove his firearm from its case to clean it or to render it inoperable before traveling by plane the day after his valid license had expired.  Whether or not during hunting season, he could not, apparently, lawfully remove his firearm from its case when seeking repairs to the firearm in an Illinois gunsmith's shop, removed from an area where hunting is permitted.  Under Mishaga's reading of Exception 10, neither Exception 5 nor Exception 10 would cover these ordinary and responsible firearm uses.  Yet from 2006 to 2014, Illinois's Department of Natural Resources sold roughly 25,000 to 27,500 nonresident hunting licenses per year, along with an additional 11,500 to 15,700 nonresident 5-day hunting licenses.  See Ill. Dep't Natural Res., IDNR License Counts, http://www.dnr.illinois.gov/ LPR/Pages/IDNRLicenseCounts.aspx.  Surely the General Assembly did not intend to criminalize the ordinary conduct of so many responsible sportsmen while at the same time allowing them to obtain nonresident hunting licenses.  The only sensible conclusion,

direction of another person, see 720 ILCS 5/24-1.2 ("Aggravated discharge of a firearm"), or unless recklessly endangering the bodily safety of an individual, see 720 ILCS 5/24-1.5 ("Reckless discharge of a firearm").

then, is that Exception 10 also applies to those law-abiding

nonresident hunters who are legally eligible to possess firearms in

their resident states, thereby filling the gap for exemptions from

criminal liability under the FOID Act when Exception 5 would not

apply.

Mishaga herself looks to a different exception in 430 ILCS

65/2(b) to advance another textual argument for her position that

"licensed" must mean that "a person has applied for and received

permission (generally in the form of a document) from an issuing

authority."  The exception, which the Court will refer to as

Exception 13, provides:

> Nonresident hunters whose state of residence does not
> require them to be licensed or registered to possess a
> firearm and only during hunting season, with valid
> hunting licenses, while accompanied by, and using a
> firearm owned by, a person who possesses a valid
> Firearm Owner's Identification Card and while in an area
> within a commercial club licensed under the Wildlife
> Code where hunting is permitted and controlled, but in
> no instance upon sites owned or managed by the
> Department of Natural Resources.

430 ILCS 65/2(b)(13) (emphasis added).  To be sure, a nonresident

hunter who hails from a state that "does not require [her] to be

licensed or registered" appears to be in the opposite position from a

nonresident who is "licensed or registered" by her resident state. The juxtaposition of these two exceptions, in turn, casts some doubt that the concept "licensed" can also include mere legal eligibility, in the absence of a license document, for otherwise qualified individuals. But legislative intent and history make clear that Exception 13 was not intended to create a new classification of nonresidents exempt from FOID Act liability. Accordingly, despite language tracking parallel to Exception 10, Exception 13 sheds little light on what is meant by "licensed or registered" under Exception 10.

Exception 13 was passed as part of Public Act 85-1336, originating in the Illinois General Assembly Senate as Senate Bill 1701, an Act to Amend the Wildlife Code. Public Act 85-1336 did more than simply add Exception 13, however. That Act also required that a limited number of no-fee wild turkey- and deer-hunting permits be issued to shareholders in land-owning corporations who wished to hunt only corporation-owned land. 1988 Ill. Legis. Serv. P.A. 85-1336 (West); see also 520 ILCS 5/3.27 ("Game breeding and hunting preserve area"). No residence requirement applies to shareholders so licensed. See 1988 Ill.

Legis. Serv. P.A. 85-1336. In its overall effect, therefore, Public Act 85-1336 was intended to create benefits to closely held corporations, commonly in the form of private hunting clubs.

In debate, the Illinois General Assembly House of Representatives made clear that some nonresident hunters on corporation land were the business clients of private hunting club members. The nonresident hunters were invited to hunt with resident club members on club land with proper hunting licenses but, as nonresidents, without FOID cards of their own. See Ill. H.R. 85-117, Reg. Sess., Transcription Deb., at 46–48 (June 16, 1988) (Statement of Rep. Mautino) (available at http://www.ilga.gov/ house/transcripts/htrans85/hts.html). Under these circumstances, the resident club member's FOID card would instead cover the invited hunter. See id. In passing Exception 13, a co-sponsor stated that the exception was not intended to "obviat[e] the importance or significance of the FOID card." Ill. H.R. 85-118, Reg. Sess., Transcription Deb., at 66 (June 17, 1988) (Statement of Rep. Olson). But such nonresident licensed hunters would be restricted to private club land alone, forbidden from State Department of Conservation land, and required to use a FOID card-

holder's firearm.  See 430 ILCS 65/2(b)(13).  The Senate concurred in the House's amendment to add Exception 13 without substantive debate.  See S. 85, Reg. Sess., Transcription Deb., at 30–31 (June 27, 1988) (Statement of Sen. O'Daniel).  In fact, the legislators spent no time discussing the need for Exception 13 when nonresident hunters—hailing from 37 states without any license document or registration system, and just 12 states, including just one of the five states bordering Illinois, with such a system—were already substantially covered by Exception 5.

From this legislative history and context, the Court concludes that the purpose of Public Act 85-1336 was not to carve out a new FOID Act exception for nonresident hunters on private club land. Rather, the purpose was only to clarify the regulations that would apply to private club land, dictating how many hunting permits would be issued, who was permitted to hunt on that land, and under what circumstances.  Indeed, given the overlap with other FOID Act exceptions applicable to nonresident hunters, the additional conduct legalized by Exception 13 is difficult to ascertain.  Cf. Conn. Nat'l Bank, 503 U.S. at 253 ("Redundancies across statutes are not unusual events in drafting[.]").

In particular, as previously discussed, Exception 5 exempts from criminal liability under the FOID Act all "[n]onresident hunters during hunting season, with valid nonresident hunting licenses and while in an area where hunting is permitted; however, at all other times and in all other places these persons must have their firearms unloaded and enclosed in a case." 430 ILCS 65/2(b)(5). Exception 5 and Exception 13, then, appear to cover substantially overlapping conduct: Both exceptions address nonresident hunters with valid nonresident hunting licenses during hunting season while in specified areas. But some distinctions between the exceptions are evident. Nonresident hunters under Exception 5 may be in any area where hunting is permitted, while nonresident hunters under Exception 13 must be on land owned by the private hunting clubs licensed under the Wildlife Code. Nonresident hunters under Exception 5 may possess their own firearms, while nonresident hunters under Exception 13 must use firearms owned by a FOID card-holder. Nonresident hunters under Exception 5 must keep their firearms unloaded and enclosed in a case at all other times, while nonresident hunters under Exception 13 may, apparently, keep their firearms loaded and unencased while they remain at the

private hunting clubs.  But where Exception 5 says nothing about nonresident hunters' license or registration in their resident states, Exception 13 is limited to nonresident hunters "whose state of residence does not require them to be licensed or registered to possess a firearm."

From this language in Exception 13, Mishaga draws the conclusion that where the Illinois General Assembly meant that a nonresident did not have to be licensed or registered through an affirmative licensing or registration application process, the General Assembly knew how to write the statutory language to make this meaning manifest.  Accordingly, Mishaga maintains that "licensed" can only mean that "a person has applied for and received permission (generally in the form of a document) from an issuing authority."

In isolation, Mishaga's argument has some persuasive force. As previously noted, a nonresident hunter from a state that "does not require [her] to be licensed or registered" (Exception 13) appears to be in the opposite position from a nonresident who is "licensed or registered" by her resident state (Exception 10).  But this reading loses its persuasive force in the context of the FOID Act as a whole.

The plain-language meaning of "licensed" comprises the concept of
mere legal eligibility.  If "licensed" did not comprise the concept of
mere legal eligibility, then the word "licensed" would become
surplusage in Exception 10's exemption from FOID Act liability for
any nonresident "licensed or registered" in her resident state.  And
under this reading, the Illinois General Assembly would have
unwittingly criminalized the ordinary and responsible conduct of
thousands of nonresident hunters invited into Illinois every year.
Defendants' position that "licensed" means mere legal eligibility
bears the virtue of avoiding both of these problems.

Put another way, Mishaga's definition for "licensed" falls into a
difficult logical trap.  To demonstrate that "licensed" must mean the
issuance of a license document, Mishaga would limit the
comparison to one between those nonresidents who are "licensed or
registered" by their resident states to possess firearms (Exception
10) and those nonresident hunters whose resident states "do[] not
require them to be licensed or registered" to possess a firearm
(Exception 13).  But so limited, the concept of "licensed" becomes
surplusage in the context of Exception 10's requirement that a
nonresident be "licensed or registered," because a registration

system and a system to issue license documents would serve precisely the same purpose and lead to the same practical result.

Therefore, the more sensible reading of "licensed," in light of plain meaning, context, legislative purpose, and legislative history, is, as Defendants argue, that a nonresident is "licensed" to possess firearms by his resident state if he is legally eligible to do so, with or without a license document evidencing his eligibility. Accordingly, Mishaga, as a nonresident whose resident state, Ohio, tacitly authorizes her possession of firearms because she is not otherwise disqualified, is exempt from FOID Act liability under Exception 10's "licensed or registered" requirement. Mishaga, therefore, does not face a credible threat of prosecution under the FOID Act if and when she chooses to exercise her Second Amendment right to keep a functional firearm for self-defense while staying in her Illinois friends' home, because her risk of prosecution is too remote where the FOID Act clearly fails to criminalize her planned course of conduct.

***

A final note in closing. The Court's decision today at least raises the specter of the law-of-the-case doctrine, as the Court

previously denied Defendants' Motion to Dismiss on the grounds that Mishaga's well-pleaded complaint made clear that she did not possess a license document issued by her resident state of Ohio to possess and carry a concealed weapon. Mishaga v. Monken, 753 F. Supp. 2d 753 (C.D. Ill. 2010). But the requirement of constitutional standing is a moving target, requiring proof of increasing persuasiveness as litigation progresses. See Davis v. Fed. Election Comm'n, 554 U.S. 724, 734 (2008) ("[T]he proof required to establish standing increases as the suit proceeds . . . ."). At this stage, on a Motion for Summary Judgment, Mishaga may "no longer rest on . . . mere allegations but must set forth by affidavit or other evidence specific facts which for purposes of the summary judgment motion will be taken to be true." Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) (citations omitted).

As illustrated in the Court's discussion of Exception 10, Mishaga's allegation at the stage of the Motion to Dismiss that she did not possess an Ohio license to possess and carry a concealed weapon was sufficient to meet her burden when all well-pleaded allegations were assumed to be true and all reasonable inferences drawn in her favor. See Tamayo v. Blagojevich, 526 F.3d 1074,

1081 (7th Cir. 2008).  But summary judgment review reveals that nonresidents also qualify as "licensed" for purposes of Exception 10 where they are able to produce competent evidence of their legal eligibility in their resident state to possess a firearm—evidence, the likes of which a document, like a concealed-carry license or another state's equivalent of the FOID card, is but one example.  The Court's holding today, therefore, is not a revision of its holding at the motion to dismiss stage that would run contrary to the law of the case, but rather a reflection of Mishaga's inability to meet the higher burden to demonstrate her standing to sue at summary judgment.

To summarize:  Because Exception 10 exempts Mishaga from criminal liability under the FOID Act, she does not face a credible threat of prosecution under the Act.  Moreover, because she does not face a credible threat of prosecution under the Act, she does not have standing under Article III of the Constitution to challenge the Act.  Where a plaintiff lacks standing under Article III, this Court lacks jurisdiction, and the plaintiff's suit must be dismissed.  Where, as here, a statute does not burden the exercise of the right to keep and bear arms, the Second Amendment is not implicated.

Accordingly, the Court does not reach the merits of Mishaga's claims under the Constitution's Article IV and Second and Fourteenth Amendments, nor the contested analysis of the proper degree of judicial scrutiny to be applied.

## V.  CONCLUSION

For the reasons stated, Mishaga has failed to show that any genuine issue of material fact exists on the question of her Article III standing.  Accordingly, Defendants' Motion for Summary Judgment (as reinstated by d/e 40) is GRANTED, and Mishaga's Motion for Summary Judgment (as reinstated by d/e 39) is DENIED.  Because Mishaga has not established standing to sue under Article III of the Constitution, her Complaint does not invoke this Court's jurisdiction and is, therefore, dismissed without prejudice.  This case is closed.

IT IS SO ORDERED.

ENTER:  September 30, 2015

FOR THE COURT:                    s/ Sue E. Myerscough
                              SUE E. MYERSCOUGH
                      UNITED STATES DISTRICT JUDGE

APPENDIX A:  Dictionary definitions of "license"

The Court considered the following dictionary definitions when assessing the plain meaning of the term "licensed" in Exception 10 to criminal liability under Illinois' FOID Act.  The Court notes that the order of definitions within a dictionary entry is not necessarily evidence of a hierarchy of primary usage.  See Antonin Scalia & Bryan A. Garner, A Note on the Use of Dictionaries, 16 Green Bag 2d 419, 423 (2013).

License, Merriam Webster's Collegiate Dictionary 671 (10th ed. 1997) ("1 a: permission to act b: freedom of action 2 a: a permission granted by competent authority to engage in a business or occupation or in an activity otherwise unlawful b: a document, plate, or tag evidencing a license granted"); id. (defining the transitive verb "license" to mean "**-censed** 1 a: to issue a license to b: to permit or authorize esp. by formal license 2: to give permission or consent to").

License, Black's Law Dictionary 919–20 (6th ed. 1990) ("The permission by competent authority to do an act which, without such permission, would be illegal, a trespass, a tort, or otherwise not allowable. . . .  Certificate or the document itself which gives permission.  Leave to do thing which licensor could prevent. . . . Permission to do a particular thing, to exercise a certain privilege or to carry on a particular business or to pursue a certain occupation.").

License, Black's Law Dictionary (Bryan A. Garner ed., 10th ed. 2014) ("1. A privilege granted by a state or city upon the payment of a fee, the recipient of the privilege then being authorized to do some act or series of acts that would otherwise be impermissible. • A license in this sense is a method of governmental regulation exercised under the police power, as with a license to drive a car, operate a taxi service, keep a dog in the city, or sell crafts as a street vendor. — Also termed *permit.* 2. A permission, usu. revocable, to commit some act that would otherwise be unlawful; esp., an agreement (not amounting to a lease or profit à prendre)

that it is lawful for the licensee to enter the licensor's land to do some act that would otherwise be illegal, such as hunting game.”).

Licensed, <u>Black's Law Dictionary</u> (Bryan A. Garner ed., 10th ed. 2014) (“Having official permission to do something, usu. as evidenced by a written certificate.”).

License, <u>Random House Dictionary of the English Language</u> 1109 (2d unabridged ed. 1987) (“**-censed** 1.  formal permission from a governmental or other constituted authority to do something, as to carry on some business or profession.  2.  a certificate, tag, plate, etc., giving proof of such permission; official permit: *a driver's license*.  3.  permission to do or not to do something. . . .  9.  to grant authoritative permission or license to.”).

License, <u>American Heritage Dictionary</u> 728 (2d college ed. 1985) (“1. A. Official or legal permission to do or own a specified thing. B. Proof of permission granted, usually in the form of a document, card, plate, or tag: *a driver's license. . . .   tr. v.* **-censed** 1. To give or yield permission to or for. 2. To grant a license to or for; authorize.”).

License, <u>American Heritage Dictionary of the English Language</u> 1009 (4th ed. 2000) (“1a. Official or legal permission to do or own a specified thing. . . .  b. A document, plate, or tag that is issued as proof of official or legal permission: *a driver's license. . . .   tr. v.* **-censed**1. To give or yield permission to or for. 2. To grant a license to or for; authorize.”).